Filed 8/28/20  Modified and Certified for Pub. 9/25/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MARIVEL SANTOS, | |
| Plaintiff and Appellant, | G057371 |
| v. | (Super. Ct. No. 30-2017-00948027) |
| CRENSHAW MANUFACTURING, INC., | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, David R. Chaffee, Judge.  Reversed.

The Holt Law Firm and David C. Holt; The Law Office of J. Felix McNulty and J. Felix McNulty for Plaintiff and Appellant.

Horvitz & Levy LLP, Karen M. Bray and Shane H. McKenzie; Severson & Werson, Kenneth C. Ward and Sharon C. Collier for Defendant and Respondent.

## INTRODUCTION

In 1982, the California Legislature passed Labor Code section 4558[1] as part of a sweeping effort to reform the state workers' compensation system. It codified a so-called "power press exception" to the principle of workers' compensation exclusivity, giving a right of action to employees injured by their employer's knowing removal of or failure to install a point of operation guard on a power press when required by the manufacturer. The California Supreme Court has in the past noted that section 4558 must be "narrowly construed" in order to give effect to the "carefully crafted compromise among employer, employee and insurer groups" represented by the legislation passed. (*LeFiell Manufacturing Co. v. Superior Court* (2012) 55 Cal.4th 275, 286 (*LeFiell*).) That makes sense.

But in this case, we must decide whether the power press exception applies when the manufacturer, 45 years prior to passage of the law, conveyed a more general requirement for guards which went completely unheeded by the present user. Under these unique circumstances, we conclude there are triable issues of material fact as to whether the employer violated the statute and reverse the trial court's grant of summary judgment in the employer's favor.

## FACTS

Appellant Marivel Santos was employed by respondent Crenshaw Manufacturing, Inc. (Crenshaw) in January 2017 as a machine operator on the production floor. Santos alleges that sometime in the second week of January 2017, she was instructed by her supervisor, Jose Flores,[2] to operate a material-forming machine utilizing a die without any protective guards or cages. Ordinarily, Santos would have had to use

---

[1] All further statutory references are to the Labor Code unless otherwise indicated.

[2] The record is unclear as to whether Flores' name is Robert or Jose. Santos refers to him as "Jose" in her workers' compensation declaration. But the declaration submitted in support of Crenshaw's summary judgment motion identifies Flores as "Robert." We will refer to him as "Flores" to avoid confusion.

both hands to operate the machine. This time, however, Flores instructed her to operate it "from the side using a bypass button." Using the machine in this manner allowed Santos to operate the machine with her right hand, leaving her left hand free to reach into the machine to "press down the part" being cut. On January 12, 2017, Santos was operating the machine in this fashion when her left hand was crushed underneath the die, mutilating and severely injuring it. She filed a workers' compensation claim against Crenshaw, and the Occupational Health & Safety Administration (OSHA) investigated.[3]

Crenshaw's President, Waleed Mansour, and Flores identified the machine as an A3 gap frame press, manufactured in or around 1937 by Niagara Machine & Tool Works (Niagara). Crenshaw purchased two Niagara A3 gap frame presses, along with other equipment, in late 2013 as part of an asset purchase from another business, Crenshaw Die & Manufacturing, Inc. (CDM). Mansour states that no one at Crenshaw has ever spoken to a representative of Niagara, and the only communication Crenshaw received from Niagara was in the form of the "instructions and parts list" it received from CDM after purchasing the presses.

It turns out both the instructions and parts list contain information about safety. The parts list identifies a "two-hand or foot tripping device" included with the machine. It does not appear to identify any other particular point of operation guard or protective barrier provided by Niagara with the machine. However, the instructions contain general warnings about the need for guards. The first warning appears on the very first page, and states: "IT IS THE EMPLOYER'S RESPONSIBILITY…TO PROVIDE PROPER DIES, GUARDS, DEVICES OR MEANS THAT MAY BE NECESSARY OR REQUIRED FOR ANY PARTICULAR USE, OPERATION, SET-

---

[3] Santos argues in her opening brief that Crenshaw disposed of and/or destroyed the press after the accident, and that Crenshaw cannot meet its initial burden on summary judgment as a result. There is evidence in the record indicating the press either no longer exists or is no longer in Crenshaw's possession. Because we reverse the judgment on different grounds, this issue is unnecessary to our decision, and we need not resolve it. (See *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 259, citing *Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65.)

UP OR SERVICE." The second warning appears on page 11, and states: "DIES SHOULD BE PROVIDED WITH ADEQUATE GUARDS TO PROTECT OPERATOR."[4]

In addition to the Instruction Manual Warnings, there were at least four signs visible on the press itself, warning about the dangers of putting hands near the point of operation of the press. Three of the signs warned about the loss of fingers or hands if proper precautions, such as guards or "safeguards," were not used. The fourth sign was affixed to the front of the press by bolts and states: "WARNING THIS PRESS IS SUPPLIED WITH A BARRIER GUARD ATTACHED. **DO NOT** REMOVE GUARD WHEN OPERATING. THIS IS FOR YOUR SAFETY & PROTECTION. **DO NOT** OIL, SET UP, OR CLEAN PRESS WHEN MOTOR IS RUNNING."[5]

Santos' sole cause of action against Crenshaw in the operative version of the complaint is for violation of section 4558.[6] Crenshaw filed a motion for summary judgment, asserting Santos failed to meet the requirements of the power press exception, and workers' compensation was therefore her exclusive remedy.[7] Crenshaw argued Niagara had never designed, provided, installed, or specified any particular guard or barrier to be used with the machine in any given context. The motion thus hinged on the information conveyed by the manufacturer to Crenshaw.

To support its argument, Crenshaw submitted, inter alia, declarations from Mansour, Flores, and its expert, John R. Manning, a mechanical engineer, as well as the instructions and parts lists Crenshaw received from CDM. Additionally, Mansour submitted documents he had received pertinent to the OSHA investigation, including a

---

[4] For ease of reference, we refer to these two warnings as the "Instruction Manual Warnings."

[5] We will refer to these four signs collectively as the "Posted Warnings," and the fourth sign in particular as the "Fourth Posted Warning."

[6] Her other four causes of action – for negligence, strict liability, breach of warranty, and loss of consortium – are alleged against Doe defendants.

[7] Crenshaw also sought summary adjudication in the alternative as to the punitive damages claim against it. Since summary judgment was granted, the alternative motion for summary adjudication was rendered moot.

4

declaration signed by Santos under penalty of perjury, and dozens of photographs of the press.

Mansour averred in his declaration that the instructions and parts list did not "reference any required or provided point of operation guards such as the two palm buttons that were attached to the machines." Since Crenshaw purchased the equipment, he stated, no additional point of operation guards had been installed. Flores made similar averments in his declaration, stating that he had been an employee of CDM prior to being employed by Crenshaw, and was aware that CDM had installed additional equipment on its presses. Among these were "light curtains and sensors, fixed and removable barriers, control boxes and two palm controls. Warning signs and stickers were added . . . at this time as well." He further averred that the press in question "did not have these barriers and two hand controls" before CDM "hired an OSHA compliance company to install them." Notably, Flores omitted mention of whether he had asked Santos to operate the press unguarded.

The most intriguing evidence submitted by Crenshaw is the Manning declaration. Manning, having reviewed the instructions and parts list, concluded neither of the Instruction Manual Warnings met the requirements of section 4558 because neither required use of any point of operation guard "by specification." Manning based this opinion on his interpretation of the statutory language. He further opined that any labeling on the electrical control enclosures was not affixed by Niagara, since the only electrical part that Niagara had provided on the press was the motor. Finally, Manning observed, a patent placard bolted onto the press had been affixed by Niagara, while "[a]ll other labels shown in the various photographs of the . . . press are decals," thus leading him to conclude the Posted Warnings were "not put on the machine by Niagara."

Two days before her opposition was due to be filed, Santos filed an ex parte application to continue the summary judgment hearing pursuant to Code of Civil Procedure section 437c(b). She claimed she had been unable to complete depositions of

several witnesses. Crenshaw opposed this application, contending plaintiff had failed to meet her burden to show what evidence she sought, and how it would assist her in opposing the motion. The trial court denied the continuance.

Santos was thus forced to file her opposition to the summary judgment motion immediately. In it, she argued Crenshaw had failed to establish that the press had been modified by CDM. She claimed Niagara had affixed the Posted Warnings and pointed to the Instruction Manual Warnings as further evidence Niagara required guards for the press.

In support, plaintiff submitted a declaration from her own expert, William Phelps, an industrial and mechanical engineer. Phelps agreed with Manning's opinion the patent listing placard was affixed by Niagara. He opined that Niagara had affixed the Fourth Posted Warning because it too had been bolted to the press. Phelps stated that, when Crenshaw took possession of the press from CDM, the asset description and valuation sheet showed safety side shields were included. Finally, Phelps stated the pneumatic two-hand control described in Niagara's parts list would have been a point of operation guard because it was designed to keep the operator's hands outside the point of operation.

Santos also filed evidentiary objections to several aspects of the Manning declaration. Principally, she deemed vague, conclusory, speculative, and lacking in foundation the averment that the Instruction Manual Warnings were not "specific" enough to meet the requirements of section 4558(c). She also objected on the same basis to his opinion on the origin of the Posted Warnings. In general, Santos contended the Manning declaration lacked evidentiary value because it was based on improper matter, speculation, and conjecture, rather than facts and evidence.

Crenshaw filed a reply brief conceding for purposes of the motion that it had removed a point of operation guard, but emphasizing the guard was not provided or required by the manufacturer. It dismissed as "foundationless conjecture" Phelps'

6

conclusion the Fourth Posted Warning had been affixed by Niagara and pointed out that any currently existing barrier guards were not included in the instruction manual and parts list.

The trial court granted Crenshaw's motion in a minute order dated September 14, 2018, finding Crenshaw had established that the instruction manual was the only communication to it from Niagara and the manual did not describe, specify, or include any point of operation guards. The trial court concluded Santos had no evidence Niagara had affixed the Posted Warnings on the press, finding the Phelps declaration inadequate. It overruled Santos' objections to the Manning declaration because they failed to comply with California Rule of Court, rule 3.1354, subdivision (b).

After the court issued its ruling, Santos filed an ex parte application to vacate the minute order, arguing the trial court had issued its ruling without having seen the reporter's transcript of the summary judgment hearing. The trial court denied the application and entered judgment. Plaintiff filed an ex parte application to vacate the minute order, which was also denied.

## DISCUSSION

Santos takes issue with two decisions of the trial court. The first, of course, is its grant of summary judgment against her. The second is the denial of her request for a continuance of the summary judgment hearing. We address the latter issue first.

### A. Denial of Continuance

Santos contends it was error for the trial court to deny the continuance under Code of Civil Procedure section 437c, subdivision (h) because she had yet to complete or receive transcripts from depositions of several witnesses, including Mansour, the OSHA investigator, Jason Brissey, and the person who "supposedly set up the power press prior to [her] use." Under Code of Civil Procedure section 437c, subdivision (h), the court may order a continuance of a summary judgment motion "if it appears from affidavits submitted" by the opposing party "that facts essential to justify opposition may

7

exist but cannot, for reasons stated, be presented[.]" (Code Civ. Proc., § 437c, subd. (h).) "A party seeking a continuance under that subdivision must show: ""'(1) the facts to be obtained are essential to opposing the motion; (2) there is reason to believe such facts may exist; and (3) the reasons why additional time is needed to obtain these facts.'"" [Citation.]" (*Combs v. Skyriver Communications, Inc.* (2008) 159 Cal.App.4th 1242, 1270.) We review this ruling of the trial court for an abuse of discretion. (*Ibid*.)

We find none. Santos made no showing that the discovery remaining to be completed would uncover facts essential to opposing Crenshaw's motion. The request for summary judgment was based on the assertion that Niagara had never required or provided a point of operation guard for the press. Santos never articulated how the witnesses she sought to depose would help her meaningfully counter that assertion. The trial court was therefore within its discretion to deny the continuance.

## B. Grant of Summary Judgment

The trial court's grant of summary judgment, however, is subject to de novo review. (*American Internat. Specialty Lines Ins. Co. v. Continental Casualty Ins. Co.* (2006) 142 Cal.App.4th 1342, 1357.) """"A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. [Citations.] The moving party bears the burden of showing the court that the plaintiff 'has not established, and cannot reasonably expect to establish,'" the elements of his or her cause of action. [Citation.]' [Citation.]" (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017). Thus, we must strictly construe the evidence offered by the moving party, and liberally construe the evidence offered by the opposing party, "resolving doubts concerning the evidence in favor of [the opposing] party." (*Id.* at pp. 1017-1018.) Santos' overarching contention on appeal is that the trial court did just the opposite – it liberally construed Crenshaw's evidence, and resolved doubts concerning the evidence in Crenshaw's favor. She further contends there

8

were triable issues of material fact as to whether Niagara had required guards on the press.

**1. Labor Code section 4558's Place in the Workers Compensation Framework**

"The basic theory of workers' compensation is that where the conditions of compensation exist, benefits under the workers' compensation act provide the exclusive remedy against an employer for injuries sustained in the course of employment . . . . Section 3602, subdivision (a) provides that the only exceptions to this exclusive remedy doctrine are those specifically described in section 3602, subdivision (b), section 3706, and section 4558." (*Award Metals, Inc. v. Superior Court* (1991) 228 Cal.App.3d 1128, 1132.) "Section 4558, subdivision (b), the exception to the exclusive remedy rule applicable to this case, provides: 'An employee, or his or her dependents in the event of the employee's death, may bring an action at law for damages against the employer where the employee's injury or death is proximately caused by the employer's knowing removal of, or knowing failure to install, a point of operation guard on a power press, and this removal or failure to install is specifically authorized by the employer under conditions known by the employer to create a probability of serious injury or death.'" (*Id.* at p. 1133.)

"The obvious legislative intent and purpose in section 4558 is to protect workers from employers who wilfully remove or fail to install appropriate guards on large power tools. Many of these power tools are run by large mechanical motors or hydraulically. [Citation.] These sorts of machines are difficult to stop while they are in their sequence of operation. Without guards, workers are susceptible to extremely serious injuries. For this reason, the Legislature passed section 4558, subdivision (b), which subjects employers to legal liability for removing guards from powerful machinery where the manufacturer has designed the machine to have a protective guard while in operation." (*Ceja v. J. R. Wood, Inc.* (1987) 196 Cal.App.3d 1372, 1377.)

9

The focus of our inquiry is subdivisions (a)(2), (a)(5), and (c) of section 4558, because these subdivisions address the power press manufacturer's role in promoting safe operation of the press. Subdivisions (a)(2) and (a)(5) define a "failure to install" or "removal" of a point of operation guard. A "'[f]ailure to install' means omitting to attach a point of operation guard either provided or required by the manufacturer, when the attachment is required by the manufacturer and made known by him or her to the employer at the time of acquisition, installation, or manufacturer-required modification of the power press." (§ 4558, subd. (a)(2).) "'Removal' means physical removal of a point of operation guard which is either installed by the manufacturer or installed by the employer pursuant to the requirements or instructions of the manufacturer." (*Id.* at subd. (a)(5).) Subdivision (c) provides a key principle in applying the statute: "No liability shall arise under [section 4558] absent proof that the manufacturer designed, installed, required, or otherwise provided by specification for the attachment of the guards and conveyed knowledge of the same to the employer. Proof of conveyance of this information to the employer by the manufacturer may come from any source." (*Id.* at subd. (c).)

Several words are repeated in these three subdivisions, but one that especially catches the eye is "require." We must decide what "require," in its varied tenses and forms, means within the context of the statute; and more broadly, the type of information a manufacturer must convey to the employer in order to "require" use of a guard.

2. **Interpreting Section 4558**

""""In analyzing statutory language, we seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose . . . ." [Citations.]' [Citation.]" (*LeFiell, supra,* 55 Cal.4th at p. 286.) And even though narrow construction must be attempted, "[w]e avoid literal, narrow or hypertechnical meanings of words so as to give effect to the manifest objectives of the legislation which

10

appear from the provisions considered as a whole, in light of legislative history."
(*Bingham v. CTS Corp.* (1991) 231 Cal.App.3d 56, 65 (*Bingham*).)  The existence of the power press exception reflects the Legislature's determination that, despite the workers' compensation bargain, "employees who must use power presses . . . potentially require additional protection and compensation" when injured.  (*Flowmaster, Inc. v. Superior Court* (1993) 16 Cal.App.4th 1019, 1029.)

According to Webster's Dictionary, the verb "require" has three modern meanings potentially applicable to our situation: (1) "to ask for authoritatively or imperatively . . . claim by right and authority . . . [or] insist upon usually with certainty or urgency"; (2) "to call for as suitable or appropriate in a particular case . . . to demand as necessary or essential . . . to demand as a necessary help or aid"; (3) "to impose a compulsion or command upon (as a person) to do something."  (See Webster's 3d New Internat. Dict. (1981) p. 1929, col. 2.)  This ordinary usage convinces us a manufacturer's "requirement" that an employer use a point of operation guard on a power press could potentially come in mandatory or more urgent suggestive language.  But what degree of specificity must a manufacturer use in "requiring" use of a point of operation guard?

Crenshaw argues that section 4558 requires a manufacturer to convey *specific* information – in other words, to identify a *particular* point of operation guard.  In support of this argument, it points to the Legislature's choice of words - the words "known," "knowing," and "knowledge" peppered throughout the statute, the phrase "otherwise provided by specification," and the definite article "the" in subdivision (c).  It believes only specific information would meet the fundamental goal of giving fair notice to those bound by the statute.  Finally, it claims that case law is "consistent" in holding that the manufacturer must convey specific guarding requirements.

We do not draw this conclusion from the case law.  The closest thing to such a pronouncement came in *Bingham*, the case upon which Santos relies.  In *Bingham*, the manufacturer of a power press brake had provided a safeguarding manual and point of

11

operation selection chart with the machine. The materials specified "particular safeguarding devices to be used while certain types of work are performed" with the machine. (*Bingham, supra,* 231 Cal.App.3d at pp. 66-67.) Not surprisingly, the court found this "constitute[d] a specification or requirement" under section 4558. (*Id.* at p. 67.) The *Bingham* court also observed that "[t]he phrase 'designed, installed, required, or otherwise provided by specification' . . . in section 4558, subdivision (c) is written in the disjunctive." (*Id.* at p. 66.) Therefore, "[i]f any inference can be derived from the evidence that any of these terms can describe the information conveyed" from the manufacturer to the employer, the employer could be liable under the power press exception. (*Ibid.*)

Such specificity, however, was unique to *Bingham.* And saying *more* will do is not the same as saying *less* will not. Most of the cases interpreting section 4558 are less demanding. Crenshaw relies on cases involving little, if any, guidance of any kind from the manufacturer. In some, the employer defendant had no information at all from the manufacturer. (See *Swanson v. Matthews Products, Inc.* (1985) 175 Cal.App.3d 901, 904 [defendant received the machine "without any instruction materials"]; *Bryer v. Santa Cruz Pasta Factory* (1995) 38 Cal.App.4th 1711, 1713 [owner had "never 'received information of any kind' from the manufacturer" of the machine].) In another, a safety device was supplied with the machine at the owner's request, and the manufacturer's standard safety device was not used. (See *Jones v. Keppeler* (1991) 228 Cal.App.3d 705, 707-708 (*Jones*) [owner instructed manufacturer to supply machine with foot controls and omit "standard two-hand simultaneous control system"].) And in yet another, the instruction materials from the manufacturer "included no reference(s) to the installation or use of a point of operation guard." (*Aguilera v. Henry Soss & Co.* (1996) 42 Cal.App.4th 1724, 1727.) Given the lack of information from the manufacturer in these cases, the respective courts found the employer had not omitted or failed to install a

12

manufacturer-specified guard. Here, in contrast, the Niagara press came with instructions, and those instructions did refer to the need for guards.

*Saldana v. Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505 (*Saldana*) provides us with some useful insight. In *Saldana*, the appellate court upheld the grant of summary judgment in favor of an employer who had attempted to make a press safer by replacing a manufacturer-supplied safety device with another safety device. (*Id.* at p. 1517.) The plaintiff there argued any removal of a manufacturer-supplied device resulted in liability under section 4558. (*Id.* at p. 1519.) The court disagreed, arguing that such a "narrow reading of section 4558, subdivision (b) . . . would lead to absurd results," because it would "inhibit employers from correcting dangerous conditions." (*Ibid.*) Implicit in this conclusion was a recognition of two important principles. First, the statute should not be read to contravene the Legislature's intentions. Second, the manufacturer may not always be the final arbiter of what is safe – sometimes, the employer must be afforded that discretion. And so long as the employer attempts in good faith to exercise it – for instance, when it attempts to make the machine *safer* than the manufacturer intended – it should not face liability.

Ultimately, the case law has only established, through *Bingham*, that a high degree of specificity in the manufacturer's safety directives will suffice under section 4558. But our question is different – what is the lowest degree of specificity that would suffice?

Crenshaw clearly believes the Legislature's choice of words is dispositive on this issue. But we do not share Crenshaw's certainty. Use of the words "know," "known," or "knowledge" tells us little, if anything. Knowledge can be general or specific in nature. Crenshaw concedes that it "knew" what was in the instructions and parts list, and it concedes for purposes of summary judgment that it removed guarding from the machine.

13

As for the phrase "otherwise provided by specification," Crenshaw advises that the maxim of noscitur a sociis permits us to construe ambiguous words in the context of the immediately surrounding words. (See *Gateway Community Charters v. Spiess* (2017) 9 Cal.App.5th 499, 504.) By this principle, Crenshaw argues, the use of the word "specification" in section 4558, subdivision (c) means that the preceding words – "designed, installed, [and] required" – also convey a requirement of a specification. Again, we are not so sure. """"Interpretations that lead to absurd results or render words surplusage are to be avoided. [Citation.]" [Citation.]' [Citation.]" (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037.) If the words "by specification" qualify all of the preceding words, the words "required" and "provided" would be redundant, as we are unsure what difference there is between "requiring by specification" and "providing by specification." In our view, the word "specification" refers not to the specificity of the information, but to "a plan or proposal for something." (Webster's 3d New Internat. Dict. (1981) p. 2187, col. 2.) Construing the term "specification" this way gives the words "required" and "provided" unique meanings. An employer may *require* use of a point of operation guard in the instruction materials, or it may *provide* a specification for one.

Nor can we agree the use of the definite article "the" is determinative. "The" is used to describe "guards" in section 4558, subdivision (c) only after the indefinite article "a" was used before "point of operation guard" in subdivision (b). Thus, "the guards" simply refers to point of operation guards. In any event, we must not construe the statute in such a "narrow" and "hypertechnical" way as to obstruct legislative intent. (See *Bingham*, *supra*, 231 Cal.App.3d at p. 65.)

We believe the Legislature's intent is best effectuated by applying section 4558 in situations where an employer has sufficient information from a manufacturer to

14

know that guards are required and completely disregards that directive.[8]  Whether the information is sufficient is a determination to be made case by case, based on the facts of the case.

### 3. Application to the Present Facts

Our analysis here focuses on the Posted Warnings and the Instruction Manual Warnings.  We do not address whether the "two-hand or foot tripping device" identified in the parts list constitutes a point of operation guard required by Niagara, as Santos recently contended in her supplemental letter brief.  To be sure, Santos has consistently cited the two-hand control as one of two point of operation guards on the press.  However, she did not argue on summary judgment that this two-hand control was a point of operation guard *required by Niagara*, as opposed to being added later on the impetus of a third party.  Her argument focused on whether barrier guards were required by Niagara.  We will not address an issue that was not properly raised before, and considered by, the trial court.

### i. The Manning Declaration

It is first necessary to consider the evidentiary value of the Manning declaration.  While Santos objected to the declaration, those objections were overruled because they failed to comply with the California Rules of Court.  "'"'Pursuant to the weight of authority, appellate courts review a trial court's rulings on evidentiary objections in summary judgment proceedings for abuse of discretion. [Citations.]' [Citation.] The party challenging a trial court's evidentiary ruling has the 'burden to establish such an abuse, which we will find only if the trial court's order exceeds the bounds of reason. [Citation.]'"'" [Citations.]" (*Schmidt v. Citibank, N.A.* (2018) 28

---

[8]    At oral argument, Crenshaw cited *LeFiell* and *Jones* to remind us of our duty to "narrowly construe" section 4558.  We are aware of the exhortation and do not believe our interpretation of the statute runs afoul of it.  Unlike *LeFiell*, permitting a trial on Santos' claims would not contravene an express term of the statute.  (See *LeFiell, supra,* 55 Cal.4th at p. 285.)  And unlike the plaintiff in *Jones*, Santos does not advocate the expansion of definitions provided in the statute.  (See *Jones*, *supra*, 228 Cal.App.3d at pp. 709-710.)

15

Cal.App.5th 1109, 1118.) Here, Santos did not challenge the trial court's rulings on her evidentiary objections and our review indicates her objections to the Manning declaration ran afoul of California Rules of Court, rule 3.1354. Thus, it was not an abuse of discretion for the trial court to overrule them.

At any rate, "[w]hen a defendant moves for summary judgment, 'its declarations and evidence must either establish a complete defense to plaintiff's action or demonstrate the absence of an essential element of plaintiff's case." (*Saldana*, *supra*, 233 Cal.App.3d at pp. 1510-1511.) The Manning declaration did not demonstrate the absence of a manufacturer requirement for a point of operation guard. It did the opposite, showing the *presence* of such evidence – namely, the Instruction Manual Warnings.

Manning dismissed the Instruction Manual Warnings and claimed they were insufficient to meet the requirements of section 4558. But Manning's role was to assist the court in understanding engineering concepts outside the common experience – not to discern the legal impact of evidence. That role resides with the trial court, and for the moment, it resides with us.

### ii. The Posted Warnings

Before we discuss the Instruction Manual Warnings, however, we first register our agreement with the trial court that there was no triable issue of material fact with regard to the Posted Warnings. There was no evidence these warnings came from Niagara. The Flores declaration established that warning stickers and labels were added to the press while it was owned by CDM and, based on the location of the first three of the Posted Warnings, Manning deduced they could not have been affixed by Niagara. This evidence was sufficient to shift the burden to Santos to demonstrate a triable issue of material fact as to these warnings.

Santos did not provide evidence in her opposition, aside from speculation, that the first three Posted Warnings were affixed by Niagara. As for the Fourth Posted Warning, she reasoned it must have been placed by Niagara because it was affixed to the

16

press with bolts, just like Niagara's patent placard. The trial court correctly rejected this assertion. The Fourth Posted Warning states that the press is supplied with a barrier guard attached. Yet, the instructions and parts list, an undisputed source of information from Niagara, contains no mention of this barrier guard. On appeal, Santos contends the language and font of the Fourth Posted Warning is similar enough to the first Instruction Manual Warning to indicate it was the work of Niagara. Similarities may exist, but Santos does not explain why Niagara would affix a sign requiring use of a guard not identified in its list.[9]

### iii. The Instruction Manual Warnings

The Instruction Manual Warnings are another matter altogether. Unlike the Posted Warnings, both parties agree these warnings came from Niagara. Thus, the questions to be resolved are: (1) whether these warnings conveyed sufficient information to Crenshaw that guards were required, and (2) if so, whether Crenshaw completely disregarded the directive. We believe there are triable issues of material fact on both questions.

Crenshaw protests that this issue was waived by Santos on appeal. Crenshaw forgets, however, that it is responsible for raising the issue, both here and in the trial court. Crenshaw discussed – or perhaps more aptly, explained away – the Instruction Manual Warnings as part of its effort to meet its burden on summary judgment. It repeated the same discussion here in its responding brief. A party cannot argue waiver of an issue raised by its own submissions. Crenshaw has argued, and continues to argue, that the Instruction Manual Warnings are of no legal significance here. We are free to test that proposition.

---

[9] We make our observations about the Posted Warnings strictly within the context of what occurred at summary judgment. We do not mean to imply that the Posted Warnings are irrelevant to the case, or that evidence pertaining to them should be inadmissible at trial. The trial court retains the discretion to determine whether such evidence should be presented to the trier of fact and for what purpose.

The second Instruction Manual Warning – "DIES SHOULD BE PROVIDED WITH ADEQUATE GUARDS TO PROTECT OPERATOR" – can be reasonably understood to require the use of "adequate guards." Crenshaw argues this language leaves it to the employer to determine what guards are "adequate." So it would seem. But the record before us indicates that no guards at all were used. We cannot interpret Niagara's adjuration to mean "guards" and "no guards" are the same thing. Interpreting the warning as Crenshaw does is a complete contravention of the manufacturer's capitalized warning.

Crenshaw further argues that the general wording of this warning fails to provide fair notice of what is required of it under section 4558. Not so. Had Crenshaw used *some* type of guard, this warning would likely have been insufficient under a narrow construction of the statute. But the record indicates Crenshaw used none. While this warning did not specify what type of guard ought to be used, it conveyed enough information for Crenshaw to know the machine should not be operated without *some* guard in place to protect the operator. Thus, to the extent Crenshaw permitted Santos to operate the press with no guards, it completely disregarded that directive from the manufacturer.

Crenshaw also argues the language of the Instruction Manual Warnings was more permissive than mandatory. But, as we have already stated, a manufacturer could potentially "require" use of a guard through urgent suggestive or mandatory language. Whether these warnings meet such a description is an issue for the trier of fact.

At oral argument, Crenshaw made a brand new contention: even if the Instruction Manual Warnings were specific requirements, the power press exception would not apply because there would have been no "removal," as that term is defined in subdivision (a)(5) of the statute. (See § 4558, subd. (a)(5).) Counsel for Crenshaw argues that the statutory definition of removal requires the guard to be "either installed by the manufacturer or installed by the employer . . . ." (*Ibid*.) Thus, since the guards in this

18

instance were supposedly installed by CDM, and not by Crenshaw, this definition would not apply. We reject this contention for several reasons.

First, as Crenshaw admitted in its brief, it conceded for purposes of summary judgment that it had removed a point of operation guard. A party may not raise for the first time on appeal issues conceded before the trial court. (*See Royster v. Montanez* (1982) 134 Cal.App.3d 362, 366-367.) We also note that the statute bases liability on either a failure to install a guard or the removal of same. Santos' complaint alleges both in the alternative. So to the extent Crenshaw negated only a removal, it did not meet its burden on summary judgment to also negate a failure to install.

But even if the removal issue were properly raised and/or dispositive, we would still reject Crenshaw's argument. As an initial matter, Crenshaw does not fully quote subdivision (a)(5) of the statute. The subdivision provides that the term "removal" applies to guards either installed by the manufacturer "or installed by the employer pursuant to the requirements or instructions of the manufacturer." (§ 4558, subd. (a)(5).)

In its ordinary meaning, the word "install" means "to set up for use or service." (Webster's 3d New Interenat. Dict. (1981) p. 1171, col. 1.) Section 4558 does not specifically define "installed," although it does define the "failure to install" as "omitting to attach a point of operation guard . . . ." (§ 4558, subds. (a)(2) & (5).) "Terms defined by the statute in which they are found will be presumed to have been used in the sense of the definition." (*In re Marriage of Stephens* (1984) 156 Cal.App.3d 909, 913.) From the Legislature's definition of the phrase "failure to install," we can reasonably ascertain that "install" is intended to be synonymous with "attach." The word "attach" means "to make fast or join . . . ." (See Webster's 3d New Internat. Dict. (1981) p. 140, col. 1.) Either definition of the word "install," therefore, is broad enough to include a guard permanently bound to a machine, or a guard fastened in a manner so as to

19

be removable.[10]  If a guard is capable of being removed, then it is possible for an employer to "install" the guard – by attaching it – every time the machine is used.  Given Niagara's instruction to use "adequate guards," a jury could reasonably conclude that Crenshaw installed the guard pursuant to Niagara's instruction each time it was attached to the machine.

We also disagree with Crenshaw's contention from a policy perspective.  We cannot imagine that the Legislature intended its definition of "removal" to shield an employer who removed a point of operation guard required by the manufacturer simply because the employer himself or herself had not installed it in the first instance.  In this case, CDM first put the guards on the machine, and the guards could be viewed as required by the manufacturer.  Crenshaw should not escape liability simply because chance interposed a middleman in this case.

## DISPOSITION

Summary judgment is reversed.  Santos is to recover her costs on appeal.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

ARONSON, J.

---

[10]     We are cognizant of the holding in *Gonzalez v. Seal Methods, Inc.* (2014) 223 Cal.App.4th 405 (*Gonzalez*) that a "point of operation guard is a device capable of being permanently attached to the power press." (*Id.* at p. 410.)  We do not agree that the definition of a point of operation guard must be so restrictive, but the *Gonzalez* facts are importantly different; the safety feature in question there was a safety block moved by the worker in and out of the point of operation.  The court therefore found it was not a device installed or removed by the manufacturer or employer.  (*Ibid*.)

20

Filed 09/25/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MARIVEL SANTOS, | |
| Plaintiff and Appellant, | G057371 |
| v. | (Super. Ct. No. 30-2017-00948027) |
| CRENSHAW MANUFACTURING, INC., | ORDER GRANTING REQUEST FOR PUBLICATION AND MODIFYING OPINION; NO CHANGE IN JUDGMENT |
| Defendant and Respondent. | |

The law firms of Esner, Chang & Boyer and Van Blois & Associates have requested that our opinion in this matter, filed August 28, 2020, be certified for publication. After reviewing the request, we have concluded the case indeed meets the requirements for publication. Pursuant to California Rules of Court, rule 8.1105(c)(2), (3), (4) and (6), the request is GRANTED.

The opinion is ordered published in the Official Reports.

It is hereby ordered that the opinion filed herein on August 28, 2020, be modified in the following particulars:

1.  On page 2, second paragraph of the Introduction, first sentence, delete the word "more" so it now reads ". . . conveyed a general requirement . . . ."

2.  On page 2, second paragraph of the Introduction, second sentence, change the word "unique" to "unusual."

These modifications do not effect a change in the judgment.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

ARONSON, J.